Good morning everyone. We're here today for oral arguments. We're going to begin with appeal number 25-1963 Zurbriggen et al. v. Twin Hill Acquisition, Incorporated et al. We'll begin with oral argument Mr. Mahaffey from you. Good morning. May it please the court. Your Honor, my name is Clay Mahaffey and I am here from the firm Burns Charest in Dallas, Texas and I appear today on behalf of 70 plaintiffs who are employees of American Airlines and who have plausibly alleged that they were injured by fabric clothing that was manufactured by the Twin Hill defendants. Six of those plaintiffs, the Bellwether plaintiffs, proceeded through a full set of discovery and substantiated their claims in response to motions for summary judgment presented by the defendants at the district court level. The district court granted the defendants motion for summary judgment. We submit that that order was in error and we ask for the reversal of that order. The foundational error in the district court's order is that it footnotes and fails to analyze the res ipsa loquitur evidentiary framework that is available to plaintiffs to establish their prima facie claim in the products liability claims that they are asserting. And in particular, the district court failed to consider the application of the Illinois State Supreme Court's variant of res ipsa loquitur that was first articulated in the Tweedy versus Wright Ford sales case. And that error permeates the district court's decision to such an extent that it also influenced the district court's analysis of the Proffert expert testimony by the plaintiffs under in its assessment of that testimony under the Dow Baird standard. Why is it appropriate to apply the Tweedy doctrine here if the asserted injury isn't related to a product malfunctioning? Well, your honor, as this court recently, I think this court's decision in Bensonburg versus FCA kind of begins and ends the analysis of the products liability claim here. And even though the facts are somewhat different in that case, there's, it stands for the proposition that certainly in a products liability action, the Tweedy evidentiary framework is available to plaintiffs provided they establish the elements of the satisfying the Tweedy's requirements. There's another case. Why is that not just as a problem with circularity in the claim that the products malfunctioned here without expert testimony? Well, your honor, again, as in Bensonburg, the question of admissibility of the expert testimony is informed by the substantive law and in this case the manner of proof, the evidentiary tool available to the plaintiffs. And so, so long as the plaintiffs can establish the elements of Tweedy itself, they should be able to proceed on a claim even though, as I'm sure you're going to hear from the defendants in a moment, they can't demonstrate specific or general causation as would be the case in what we might refer to as a toxic tort. Did that answer your question? It still sounds circular to me. Well, if I might, I think the . . . Unless you've got expert proof of causation, can a plaintiff get to a jury by saying I think this product hurt me? The Tweedy allows an inference of causation if the plaintiffs can demonstrate they meet the elements of Tweedy itself and that requires . . . I understand the Tweedy's the brake case, right? Tweedy is a brake case, that's correct, Your Honor. There's a car accident. Brakes didn't work. The driver says the brakes didn't work. I don't need to prove exactly what was wrong with it. But there are a whole lot of other potential causes for skin rashes and hives and the kinds of symptoms that the plaintiffs are asserting, right? That's correct, Your Honor. And indeed here, the plaintiffs . . . One reason Tweedy is available and the reason that the plaintiffs meet the Tweedy standard is because they have demonstrated through expert testimony, if that testimony had been viewed through the proper lens, through Dr. Hauser, a defect, an inference of defect because there were sensitizers, 23 sensitizers present in the finished garments that should not have been there had they been properly manufactured. And then with Dr. Carson, who is board certified, who is a board certified, he conducted a differential diagnosis with respect to each of the six Bellwether plaintiffs and ruled out reasonable alternative causes. And there is a very important distinction that I think we're going to be examining here later. The plaintiffs need not demonstrate that they have ruled out all possible alternative causes for their injury, only those that are reasonable. And they've done that, Your Honor, through the testimony of Dr. Carson with his differential diagnosis. Again, he is a medical doctor. He conducted a physical examination of each of the six Bellwether plaintiffs. He ruled out other causes, including he looked at their medical history, ruled out prior history of allergic reactions to, you know, to other fabrics and those sorts of things, and also looked at external environmental factors that could have contributed to the injury and ruled those out. In addition, Dr. Carson, if we view his testimony through the proper lens of, you know, ruling out reasonable other causes for the plaintiff's injuries, he provided a Bradford Hill analysis where he looked at, you know, the eight factors applicable, or I guess eight of the nine factors applicable under Bradford Hill, and he looked at the facts including that, you know, the symptoms here manifested immediately after the introduction of the uniforms into the workplace, that the symptoms for the plaintiffs in particular, but the symptoms for many people who reported symptoms, went away when they were no longer wearing the uniform or no longer near the uniform. Mr. Renhaffi, can I take you back to race ipsa for a second? Yes, Your Honor. And just straight up negligence here. What I have a little difficulty with is, I've got a limiting principle question. It's a little bit, it's similar to kind of coming out of what Judge Hamilton is asking. It seems to me that in a case like this where you have, you have some trouble in the district court with your experts. To read race ipsa, the race ipsa doctrine as broadly as you do. I don't know why all plaintiffs in products cases under a negligence theory or a strict liability theory wouldn't say to heck with the experts. We're just going to rely upon race ipsa, and we're going to rely upon race ipsa in a way, this is embedded in my question, that is broader than at least I read Illinois law on race ipsa. We're going to rely upon it not only to establish, as it has historically, a And, you know, you wouldn't expect the airbag to go off. You wouldn't expect the lawnmower to function this way. I don't know why everybody wouldn't come in and just say, forget the experts, race ipsa, and we'll shift the burden over. There's a lot loaded into that question, Your Honor, but I think if I can tackle the first issue, which is, is expert testimony required, I think there is ample case law in the circuit and in the Illinois state courts suggesting that, you know, some of these cases are complicated enough that certainly it would be, you know, impermissible for a plaintiff to proceed without any expert testimony supporting their assertion that there should be the inference. So, and I think Bensonburg itself is a good example of that, where there was an examination of the. And what I, what I worry about with your position is that you're, you're reading, you're, you're trying to use race ipsa in a way that would just supplant all of that case law, just totally set it aside. Respectfully, I think we are, are in line with, with a lot of those cases where, where the courts have permitted this sort of inference. And, you know, in Donaldson versus Johnson and Johnson, and in Kalal versus the Seva, Seva was certainly adequately equipped to, to determine whether or not the plaintiffs were stretching. And in both of those cases, of course, there was no real proffered expert testimony that would explain alternative, alternative explanations for the, for the injury. And respectfully, we've offered that testimony here. Of course, it's the issue of that, the exclusion of that testimony under Daubert and its relevance to the race ipsa question are, are tied together, I would say. On that expert question, the amicus brief makes the argument that the amendments to 702 have been considered by Judge Tharp, but were not, are not being considered by the plaintiffs. Your response? Our response is, is there really doesn't seem to be an intended change in this regard to Rule 702 is our, our reading of, of, so, so I don't know that there's much validity to that position that the amicus takes. I'm, I don't know if that was fully responsive to your question. Well, the, it's, I think it's more than a matter of emphasis. The amendments went through, they do apply. It appears the district judge was tracking that language. And obviously, the experts are the core here. If their expert testimony, opinion testimony is required for purposes of proving, proving liability here, and those have been excluded, your clients are just in a very difficult position. Unless there's a theory of liability that you're relying on outside of race ipsa or outside of tweaking, is there? Well, there is a theory of liability that we are relying, of course there are intentional tort claims that we haven't discussed as of now, but the main, the core of the case is certainly the product's liability claim. I'm happy to answer any other questions. I see I'm. You may reserve the remainder of your time for it. I'd like to reserve the remainder if that's all right. Very good. Yes, Mr. Mahaffey, thank you. Thank you. We'll continue now with argument on behalf of the appellee from Mr. Greenberg-Trarick, and I'm here on behalf of Twin Hill. And I'll be relatively brief and focus on the race ipsa question that your honors were also focused on. As the trial court made clear, inferring negligence through race ipsa requires proof that a plaintiff's injury ordinarily would not happen in the absence of negligence. Here, as the district court pointed out, the record decidedly forecloses any such notion given that the plaintiff's symptoms were in no way unique to exposure to a toxic substance. The intertect results do not indicate that any detected substance was capable of triggering the plaintiff's symptoms at low concentrations, and there were several alternative explanations for the plaintiff's symptoms that were not only plausible but likely on the record. For example, one of the plaintiffs had a history of food allergies, another plaintiff had a history of skin rashes, and in fact questioned her psychiatrist as to why she couldn't find a doctor to point her rashes at the uniform. So under this record, it's very clear that there were certainly other issues that could have triggered the plaintiff's symptoms in a way that is not necessarily limited to these uniforms. And in fact, in the Seventh Circuit's decision in Donaldson versus Johnson and Johnson, which counsel referred to, this court affirmed entry of summary judgment in a pelvic mesh case where there was no evidence in the record eliminating abnormal use of secondary causes. And similar to this case, plaintiff presented no medical evidence that the secondary causes offered by defendants' life experts were not the likely source of the injuries. We have a similar situation here where there's a whole panoply of things that could have caused plaintiff's symptoms. And in fact, plaintiff's expert, Dr. Carson, relies on reports that were called in to a call center. At least one of the plaintiffs indicated that she had made ten to a hundred calls to the call center or entries in the call center website. So you had a whole rash of people complaining about things but no real proof. And in fact, you know, as Dr. Carson testified, and I'm referring to docket 531 exhibit H, he was asked, are you opining that any of the sensitizers or irritants identified by Intertec caused the bellwether plaintiff's alleged health problems? He answered no. And then was questioned, have you yourself done any testing of the Twin Hill garments? I have not. Questioned, why didn't you? That's not my role in this case. Similarly, when questioned about Plaintiff Joy, was asked that, so it's referring to his expert report, he was asked, so it says here she developed a type 1 hypersensitivity to substances carried by the Twin Hill uniforms. What substances are you referring to there? And he answered the uniform itself, pieces of it. So again, he failed to identify specific chemicals in the uniform. And which garments specifically are you referring to? Answer, I'm referring to the whole class of Twin Hill uniform garments. Now keep in mind that entire class of Twin Hill uniforms is approximately 250 pieces of uniforms made in 14 different factories. So the entire universe of uniforms is obviously quite large and quite diverse. And then he was asked, now Ms. Vera would have encountered specific Twin Hill garments, right? Not a generalized class of them. She was, she had certain garments that she wore and she was exposed to other flight attendants and pilots who were wearing other garments. I think among them she was probably exposed to pretty much the spectrum of the Twin Hill collection. What do you base that on? Common sense. I would argue that it's actually the opposite of common sense to suggest that a single plaintiff was exposed to over 250 garments when in fact, you know, she obviously couldn't have been. So we would ask that the court affirm the entry of judgment. Ray Sipsa or its counterpart under Tweedy certainly doesn't apply here. This is not the typical Ray Sipsa case that we all learned in law school where, for example, the piano or the barrels fell out of the window and injured the unsuspecting plaintiff. So unless the court has any questions, I will hold up. Thank you, Mr. Sotero. Thank you. Mr. Zerro, we'll move to you now for oral argument. Good morning, your honors. May it please the court. Jason Zerro on behalf of the airline defendants, collectively American. I'm here to talk only about the intentional tort claims because those are the only claims asserted against American. Plaintiffs allege that American committed battery and IIED by exposing them to toxic uniforms that caused them to suffer proximity reactions. That factual theory was far-fetched. As the court is well aware from the party's briefing, there is no scientific support for the idea that a piece of clothing can cause someone else to sustain a proximity reaction. Nevertheless, plaintiffs' burden at summary judgment was to prove the claims they alleged. Unsurprisingly, plaintiffs were unable to do so because their expert on the harmfulness of the uniforms, Dr. Carson, did not employ a reliable methodology, much like the expert in this court's recent case involving Lance End. Plaintiffs' sole argument as to their intentional tort claims on appeal is that harmfulness is not an element of battery and IIED. And that is true, but it's not relevant. Plaintiffs alleged that the battery and IIED in this case consisted of being exposed to harmful uniforms, and so that is what they needed to prove. The factual allegation, what the battery consisted of, was exposure to a harmful uniform, and at summary judgment the plaintiff must allege the factual allegations they proved. This is no different, for example, than a simplified battery case involving a touch on the shoulder. Obviously, a touch on the shoulder is not an element of a battery claim or an IIED claim, but if that's the factual theory the plaintiffs alleged that constituted the battery, a touch on the shoulder, then they needed to prove a touch on the shoulder. And if they couldn't prove that a shoulder touch occurred at the summary judgment stage, then they would simply lose, which is exactly what happened in this case. As plaintiffs alleged, they were exposed to harmful uniforms and couldn't prove that the uniforms were harmful at all. I think a little bit of what's going on in plaintiffs' brief is that they want to shift theories on appeal away from their allegations in their complaint and the decision by the district court at the decision-to-dismiss stage, and then the party's many, many years of discovery about the harmfulness of the uniforms, to a new theory that they were afraid of being around the uniforms whether or not they were harmful. So I think their central contention, if you look at their appellate briefs, is forget harmfulness, you don't need to worry about that, we actually didn't need Dr. Carson's testimony, we were just afraid of being around the uniforms. That's not a viable theory of battery or IIED, but this court doesn't need to consider it in this case because it wasn't alleged in the complaint, and under this court's cases like Chessie Logistics and cases that follow Chessie Logistics, district courts have wide discretion not to consider new factual theories on appeal. We made that argument in our opposition brief and plaintiffs just didn't respond to it in reply. The argument is correct, but their response to it is also forfeited, so for that reason, too, you don't need to consider the new factual theory that plaintiffs have gestured at, I think, charitably on appeal. So we think we asked the court to affirm for the reasons stated by the district court, and unless the court has any questions, I'm happy to see the balance of my time. Thank you, Mr. Zero. Thank you. Mr. Mahaffey, we'll go back to you now for rebuttal argument. May it please the court. I'd like to respond briefly in order to the points made by opposing counsel. First, the points made by counsel for Twin Hill. He stated that there's no evidence that the injuries here wouldn't have happened absent, would not happen absent negligence, and that is precisely the testimony of Dr. Hauser in establishing that there was a defect in these particular uniforms, and his opinion is that substantiates and supports the inference that an ordinary end-user for a garment would not expect to have an allergic reaction or another adverse reaction to the finished product, right? And in addition to that... Can I ask you a question about... One of the things I'm a little concerned with with the Dr. Hauser testimony is he acknowledged, I think in his deposition, you'll know where it wherever it came from, that he was asked to assume that the health issues that the plaintiffs are complaining about only began to appear after the Twin Hill garments started to be used. I believe that is an assumption he testified to. Dr. Hauser testified to. Dr. Carson, though, our other expert who did the differential diagnosis, is the one who supplies the opinion relating to whether or not there is a causal connection between the uniforms and the symptoms complained of by the plaintiff. Okay, so you're relying more on Carson. So, in other words, Dr. Hauser more or less assumed, you're correct, that the symptoms... Assumed the causation. In a manner, yes. There was reference by Mr. Sotero to, you know, to Dr. Hauser and Dr. Carson not being able to identify specific garments or specific substances within those garments, and that is correct. The plaintiffs cannot meet here a specific causation showing, and that is precisely why they seek to avail themselves of the evidentiary tool that's that's allowed per Tweety. So, Mr. Mahaffey, I guess what troubles me here is that the effects and causes your clients are alleging here seem like they ought to be eminently testable, but they weren't. They weren't eminently testable. They were eminently testable, but you did not test them, and nor did your experts. And nor did the defendants, Your Honor. Despite the numerous complaints, they did some testing and the defendants... They did the inter-tech testing, right? Correct. The burden's on you. Why didn't you do more? Of the tens of thousands of chemicals that are involved in the making of these garments, and frankly, I'm surprised at the number of chemicals that are involved in garment manufacture. Now I'm familiar with that. There simply was no way to discern from the entirety of the uniform collection a, you know, a specific substance within any of those garments that was directly causing the plaintiff's harm. And that testing, in addition to being tremendously expensive, is just more difficult than I think the question suggests. I see I'm running short of time. If I might briefly respond to the points that American Airlines made. They, in large part in their briefing, took the position that the plaintiffs, in order to demonstrate the elements of the intentional tort claims, needed to meet this elevated showing of harm, specific and general causation. And if I understood the argument correctly, it seems that they have now somewhat abandoned that position. And that was certainly a part of the district court's analysis of the intentional tort claims. And so it appears that that is no longer an issue. Thank you, Mr. Mahaffey. Thank you. Thank you, Mr. Sotero. Thank you.